# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

DIANA OPHELIA HUSSEY        CIVIL ACTION NO. 6:17-cv-01554

VERSUS        JUDGE HANNA

U.S. COMMISSIONER,        BY CONSENT OF THE PARTIES
SOCIAL SECURITY
ADMINISTRATION

## MEMORANDUM  RULING

In accordance with the provisions of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the parties consented to have this matter resolved by the undersigned Magistrate Judge, and it was referred to the undersigned Magistrate Judge for all proceedings, including entry of judgment.  (Rec. Docs. 12).  Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, the Commissioner's decision is affirmed.

## Administrative Proceedings

The claimant, Diana Ophelia Hussey,[1] fully exhausted her administrative remedies before filing this action in federal court.  She filed applications for disability insurance benefits ("DIB"), supplemental security income benefits

---

[1] Ms. Hussey was sometimes referred to in the record as Diana Journet.

("SSI"), and disabled widow's benefits ("DWB"), alleging that she became disabled on September 10, 2010.[2]  Her applications were denied.[3]  She requested a hearing, which was held on July 7, 2016 before Administrative Law Judge Tamia N. Gordon.[4]  The ALJ decided that the claimant was not disabled within the meaning of the Social Security Act from September 10, 2010 (the alleged disability onset date) through August 30, 2016 (the date of the decision).  Ms. Hussey requested review of the decision, but the Appeals Council found no basis for review.[5]  Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g).  Ms. Hussey then filed this action seeking review of the Commissioner's decision.

## Summary of Pertinent Facts

The claimant was born on July 23, 1964.[6]  At the time of the ALJ's decision, she was 52 years old.  She graduated from high school,[7] and has relevant work experience as a patient care attendant.[8]  She alleged that she has been disabled since

---

[2]        Rec. Doc. 7-1 at 203, 207, 214.

[3]        Rec. Doc. 7-1 at 106, 107, 108.

[4]        A transcript of the hearing is found at Rec. Doc. 7-1 at 47-77.

[5]        Rec. Doc. 7-1 at 6.

[6]        Rec. Doc. 7-1 at 56, 234.

[7]        Rec. Doc. 7-1 at 56, 239.

[8]        Rec. Doc. 7-1 at 239, 250.

September 10, 2010[9] due to vascular headaches, seizures, a low back injury, left temporal dysfunction, and an electrolyte imbalance.[10]

On September 29, 2010,[11] Ms. Hussey saw Dr. David S. Muldowny, an orthopaedic surgeon with Lafayette Bone and Joint Clinic in Lafayette, Louisiana, for the first time. She reported that she injured her low back while working on September 10, 2010 when the person she was caring for fell forward and Ms. Hussey grabbed the patient around the waist and lifted her upward. Ms. Hussey claimed to have immediately felt back pain that, within a few hours, radiated into her legs. She sought treatment in the emergency room of Our Lady of Lourdes Hospital and was diagnosed with pulled muscles. She was given Lortab, Naproxen, and Flexeril, and released. She then saw Dr. Paul Fenn, the physician assigned by her employer's workers' compensation carrier. She reported to Dr. Muldowny that she had never had a previous back problem and had not previously seen a doctor for low back issues. She reported low back pain that she rated at four on a ten point scale and described the pain as aching, burning, and tingling. She stated that it worsened with walking, sleeping, bending, stooping, sitting, and driving. Laying down helped the pain. She had not worked since the injury.

---

[9]     Rec. Doc. 7-1 at 203, 207, 214.

[10]    Rec. Doc. 7-1 at 78.

[11]    Rec. Doc. 7-1 at 458-460.

Upon examination, Dr. Muldowny found that the claimant had a normal gait and a level pelvis. Straight leg raise tests were negative. Her leg reflexes were normal and sensation in her legs was intact. Dr. Muldowny obtained x-rays that showed substantial degenerative changes at L3-4 with disc space narrowing, anterior osteophytes, and some irregularity of the endplate. He diagnosed degenerative disc disease of the lumbar spine and lumbar strain. He planned to obtain an MRI of her lumbar spine.

An MRI examination of the claimant's lumbar spine was performed on October 13, 2010.[12] Ms. Hussey returned to Dr. Muldowny on October 27, 2010,[13] and Dr. Muldowny noted that the MRI showed disc desiccation at multiple levels, with desiccation and narrowing at L1-2 and L3-4; mild desiccation at L3-4, L4-5, and L5-S1; and a small bulge at L4-5 in the left paracentral area with a very small high intensity zone in the posterior annulus. He prescribed physical therapy.

The claimant saw Dr. Muldowny again on December 1, 2010.[14] She reported good improvement in pain with physical therapy. When she returned on January 5,

---

[12]     Rec. Doc. 7-1 at 356-357.

[13]     Rec. Doc. 7-1 at 461.

[14]     Rec. Doc. 7-1 at 462.

2011,[15] she reported a pinching pain in the upper part of her back, but she was continuing with physical therapy.

On February 2, 2011, the claimant again saw Dr. Muldowny.[16] She was doing about the same but had stopped taking Lortab and Naprosyn due to side effects. She was in physical therapy and not working. Straight leg raise tests were negative.

Ms. Hussey returned to Dr. Muldowny on April 19, 2011,[17] after having a functional capacity evaluation that indicated she could do light work. Dr. Muldowny opined that the evaluation was reasonable and precluded her from returning to her previous work, which required medium level work. Upon examination, there was no tenderness to palpation of her lumbar spine, the muscle strength in her legs was not impaired, and straight leg raise tests were negative. Dr. Muldowny released the claimant to work light duty work, four hours per day.

The claimant saw Dr. Muldowny again on May 17, 2011.[18] She still complained of back pain but she was no worse. There was no tenderness to palpation, no impairment in leg muscle strength, and straight leg raise tests were negative. Dr. Muldowny explained that he was not recommending surgical

---

[15]     Rec. Doc. 7-1 at 463.

[16]     Rec. Doc. 7-1 at 464.

[17]     Rec. Doc. 7-1 at 465.

[18]     Rec. Doc. 7-1 at 466.

intervention. He advised the claimant to be as active as possible. She was planning to see an employment counselor.

When the claimant saw Dr. Muldowny again on June 28, 2011,[19] she complained of low back pain with pain radiating into her feet as well as numbness in her feet. She reported that the pain was constant and woke her up. She was planning to return to work. There was no tenderness to palpation, no impairment in leg muscle strength, and straight leg raise tests were negative.

On September 27, 2011, Ms. Hussey told Dr. Muldowny that she was doing worse.[20] She had stopped taking anti-inflammatory medication due to perceived side effects, and her back pain had increased to nine out of ten. She was also having leg pain primarily in the left leg, although her pain had previously been primarily in the right leg. In addition to low back pain, she was having central and bilateral sided back pain. Dr. Muldowny ordered an updated MRI exam. She had no tenderness to palpation, no impairment in leg muscle strength, and negative straight leg raise tests.

An MRI of the lumbar spine obtained on October 6, 2011[21] showed mild degenerative disc disease including an L4-5 left foraminal zone annular disc fissure and mild bilateral foraminal narrowing at L4-5 and L5-S1.

---

[19]     Rec. Doc. 7-1 at 467.

[20]     Rec. Doc. 7-1 at 468.

[21]     Rec. Doc. 7-1 at 358-359.

When the claimant saw Dr. Muldowny on October 18, 2011,[22] he shared the results of the MRI with her and noted that she was working light duty. His examination yielded the same results as previously, and he recommended continuing the same treatment.

Ms. Hussey followed up with Dr. Muldowny on December 20, 2011.[23] According to Dr. Muldowny, she was slightly worse. She was continuing to have low back pain radiating into her legs with bilateral foot numbness. She reported that the numbness affected her ability to feel the pedals while driving. She requested a different pain medication so that she could reserve narcotics for night time. Tramadol was added for day time pain. She was to continue on light duty status.

On February 1, 2012, Ms. Hussey told Dr. Muldowny that she was doing worse. The pain was moving from her low back into her right buttock and down her leg. She reported that working made the pain worse, and she had taken some time off. Dr. Muldowny recommended an EMG/nerve conduction study of her right leg. Again, however, there was no tenderness to palpation, no impairment in leg muscle strength, and negative straight leg raise tests.

---

[22]    Rec. Doc. 7-1 at 469.

[23]    Rec. Doc. 7-1 at 470.

The claimant saw Dr. Daniel L. Hodges on February 28, 2012 for the nerve conduction study, which showed low grade L5 radiculopathy.[24]

When Ms. Hussey returned to Dr. Muldowny on March 6, 2012,[25] she complained of back and bilateral leg pain, worse on the right than the left. Dr. Muldowny recommended an epidural steroid injection at L4-5.

Ms. Hussey returned to Dr. Muldowny on April 3, 2012.[26] She had not had the epidural injection because she is allergic to cortisone. She complained of back pain and leg weakness. She told Dr. Muldowny that she could not walk for very long. Upon examination, he detected mild to moderate tenderness in the lumbrosacral area, centrally and slightly off to the right, but no tenderness to palpation or light percussion in the lumbar area in the mid-lumbar spine. There was no pain on axial compression. The muscle strength in her legs remained unimpaired, her sensation was intact, and straight leg raise tests were negative. Dr. Muldowny counseled against surgery, recommended a functional capacity evaluation, and recommended a referral to Dr. Hodges for pain management.

---

[24]     Rec. Doc. 7-1 at 399.

[25]     Rec. Doc. 7-1 at 472.

[26]     Rec. Doc. 7-1 at 473.

A functional capacity evaluation was conducted by physical therapist Micah Harriss of Southern Spine Institute on April 16, 2012.[27] Mr. Harriss concluded that Ms. Hussey was able to perform sedentary work, and he recommended a short-term work conditioning program to improve her physical abilities.

Ms. Hussey returned to Dr. Muldowny on April 24, 2012.[28] She complained of "quite significant pain" and reported that her legs sometimes give out, causing her to fall. But she could not identify which leg gave out. Her straight leg raise tests were again negative. Dr. Muldowny recommended that she proceed with a work conditioning program and that she be referred to pain management.

The claimant saw Dr. Daniel L. Hodges for pain management on May 17, 2012.[29] She complained of back pain, bilateral leg pain and stiffness, and bilateral foot numbness. She rated her pain at seven out of ten. She reported that the pain was aggravated by walking, bending, sitting for long periods, and standing for long periods. She also complained of numbness and weakness in her legs and feet, vascular headaches, and difficulty sleeping. Upon examination, Ms. Hussey exhibited pain on extension but she could flex forward, touching her toes. She had difficulty squatting. She appeared to be intact neurologically and she had no obvious

---

[27]     Rec. Doc. 7-1 at 360.

[28]     Rec. Doc. 7-1 at 474.

[29]     Rec. Doc. 7-1 at 400-404.

motor or sensory deficits in her upper or lower extremities. Dr. Hodges's impression was multilevel degenerative disc disease with acute and chronic low back and leg pain with intermittent radiculitis. He prescribed Hydrocodone and Amitriptyline.

The claimant returned to Dr. Hodges on June 14, 2012[30] with the same symptoms. She had difficulty with heel and toe maneuvers and was unable to squat. She also had decreased pinprick sensation over the L5 distribution bilaterally. Medication therapy was continued.

Ms. Hussey returned to Dr. Muldowny on July 18, 2012.[31] She complained of lumbrosacral pain. She also complained that her leg gives out for no apparent reason, causing her to fall. Dr. Muldowny noted that the work conditioning program had not yet been approved. There was mild tenderness to palpation but normal strength and sensation. Dr. Muldowny noted that he had no explanation for her leg giving out, as nothing was shown on the MRI that might cause that to happen.

When the claimant returned to Dr. Muldowny on August 22, 2012,[32] the work conditioning program had still not been approved. Muscle strength and sensation were intact. Straight leg raise tests were negative. She was interested in pursuing

---

[30]     Rec. Doc. 7-1 at 405-407.

[31]     Rec. Doc. 7-1 at 475.

[32]     Rec. Doc. 7-1 at 476.

surgery but Dr. Muldowny suggested a psychologic evaluation to see if she was a suitable candidate for surgery.

The claimant saw Dr. Hodges again on September 13, 2012.[33] Examination showed that her lumbar range of motion was diminished. She had pain on attempts at extension and flexion as well as during concurrent lateral bending and rotation. She had difficulty with heel and toe maneuvers. Her medications were adjusted.

The claimant's headache complaints were evaluated at University Medical Center ("UMC") in Lafayette, Louisiana, on November 26, 2012.[34] A CT scan of her brain obtained that day was normal. An EEG was mildly abnormal, suggesting the possibility of a left temporal dysfunction and raising the possibility of an underlying structural brain abnormality.[35]

The claimant returned to Dr. Hodges on December 13, 2012.[36] Her chief complaint was back and leg pain. She indicated that her pain was constant and worsened by normal daily activities. She stated that she had been having headaches and had been diagnosed with vascular dysfunction. Her medications were adjusted.

---

[33]     Rec. Doc. 7-1 at 408-410.

[34]     Rec. Doc. 7-1 at 375-376.

[35]     Rec. Doc. 7-1 at 435.

[36]     Rec. Doc. 7-1 at 411.

On December 19, 2012,[37] Ms. Hussey was seen by Dr. Muldowny, who was awaiting the results of a psychological evaluation from the week before. Muscle strength in her legs was normal, sensation was intact, and straight leg raise tests were negative.

The claimant saw Dr. Hodges again on March 21, 2013.[38] She reported that weather changes and increased daily activities increase her pain while rest, heat, and cold compresses alleviated her pain. She was given information on an anti-inflammatory diet, sleep and relaxation techniques, and the importance of a good mattress and pillow. Her cervical spine range of motion was normal, and she had good strength in her upper extremities. She had pain on extension and flexion of the lumbar spine and on lateral bending and rotation. She could heel and toe walk, but had difficulty squatting. Her medication was adjusted.

Ms. Hussey returned to Dr. Muldowny on March 26, 2013[39] after completing psychological testing. She complained of back pain and right leg pain. Straight leg raising produced some leg pain on the right. The psychosocial evaluation suggested significant somatoform behavior. This occurs when a patient experiences physical symptoms that are inconsistent with or cannot be fully explained by any underlying

---

[37]    Rec. Doc. 7-1at 477.

[38]    Rec. Doc. 7-1 at 412.

[39]    Rec. Doc. 7-1 at 478.

medical condition.[40]  She was at high risk for a poor response to surgery, and additional psychotherapy was recommended.  Dr. Muldowny recommended postponing surgery until after the claimant addressed psychosocial issues.

The claimant saw a neurologist at UMC on April 19, 2013.[41]  The treatment notes are largely illegible but left temporal dysfunction is mentioned.  An EEG on May 1, 2013 was normal.[42]

The claimant was seen in the emergency department at UMC on May 22, 2013 with headache complaints.[43]  She gave a history of chronic back pain.

The claimant returned to Dr. Muldowny on May 28, 2013,[44] still having back and leg pain.  She had begun psychotherapy.  Her current treatment was continued.

Ms. Hussey followed up at the neurology clinic at UMC on June 7, 2013.[45] She reported that her headaches were better since a recent medication adjustment.

---

[40]      Medscape,      https://emedicine.medscape.com/article/918628-overview      (last     visited November 7, 2014).

[41]      Rec. Doc. 7-1a t 431-434.

[42]      Rec. Doc. 7-1 at 430.

[43]      Rec. Doc. 7-1 at 348-355.

[44]      Rec. Doc. 7-1 at 479.

[45]      Rec. Doc. 7-1 at 426-429.

Ms. Hussey saw Dr. Hodges on June 19, 2013.[46] He noted that she was being treated by a neurologist for seizures and seeing a psychologist at the direction of her workers' compensation insurance carrier. She complained of back pain radiating into both legs and feet, aggravated by movement. She stated, however, that she does get relief with mediation. Examination of her back showed a slightly forward flexed posture, a restricted range of motion on extension and flexion with complaints of pain, and moderate dysrhythmia. Motor function was intact in both legs. Toe and heel walking was impaired. She had positive straight leg raise tests on both legs. Dr. Hodges adjusted her medications.

The claimant returned to Dr. Muldowny on September 3, 2013.[47] She had normal muscle strength in both legs, no impairment in tandem walking, walking on toes, or walking on heels. Her gait was normal, and straight leg raise tests were negative. Dr. Muldowny was awaiting a report from the psychologist clearing her for surgery.

The claimant was seen at UMC on November 16, 2013.[48] The handwritten treatment note is very difficult to read, but it seems that the claimant was doing well,

---

[46]     Rec. Doc. 7-1 at 413-416.

[47]     Rec. Doc. 7-1 at 480-482.

[48]     Rec. Doc. 7-1 at 420-425.

had no current complaints, and was following up with regard to treatment for a seizure disorder, temporal dysfunction, vascular headaches, and other issues.

The claimant saw Dr. Muldowny on November 19, 2013.[49] He noted that she had not yet been approved for surgery by her workers' compensation insurance carrier even though the psychologist had opined that she was no longer at risk for a poor result from a psychosocial standpoint. Her legs were normal neurologically. Her gait and station were normal. The muscle strength and tone in her legs was normal. Straight leg raise tests were negative. In Dr. Muldowny's opinion, the MRI showed an annular tear at L4-5 that was causing her pain.

Ms. Hussey was seen in the emergency department of American Legion Hospital in Crowley, Louisiana on April 2, 2014, complaining of nausea and vomiting.[50] She was given medications and discharged.

A health summary from UMC dated September 19, 2014 indicated that the claimant was being treated by Dr. Fabian Lugo, a neurologist, for epilepsy.[51] On that same date, the claimant was seen in UMC's internal medicine clinic.[52] The claimant complained that her seizures were getting worse. The treatment note

---

[49]     Rec. Doc. 7-1 at 483-485.

[50]     Rec. Doc. 7-1 at 490-523.

[51]     Rec. Doc. 7-1 at 766.

[52]     Rec. Doc. 7-1 at 537-550.

indicated that she was first diagnosed with seizures in November 2012 and that her last seizure was three months previously. She was taking Lamictal. Her dosage of that medication was adjusted, and Hydroxyzine Pamoate was prescribed.

On March 28, 2015, the claimant was examined by Dr. Jean-Victor Bonnaig for Disability Determination Services.[53] The claimant drove herself to the appointment. Dr. Bonnaig noted that she was a poor historian. She gave a history of seizures, vascular headaches, and an electrolyte imbalance. She stated that her seizures cause her to "stay confused," cause short term memory loss, and make her unable to find things. She reported low back problems since lifting a heavy patient in 2010. She reported a history of anxiety. She reported a history of throbbing headaches in the temporal area associated with vision changes and seizures that were relieved by taking prescription medication. She reported a history of petit mal seizures eight times per month over the previous two years that left her sleepy. She claimed to have had an unwitnessed seizure three days earlier. The claimant reported that she can walk only very short distances on level ground, has difficulty standing for more than five minutes, can lift ten to twenty-five pounds without difficulty with either arm, can sweep, mop, vacuum, or do dishes for up to fifteen minutes at a time, can cook for up to thirty minutes at a time, can climb no more than two or three

---

[53]     Rec. Doc. 7-1 at 553-560.

steps, cannot care for a yard or mow grass, and cannot balance a checkbook. Dr. Bonnaig observed the claimant get up and out of a chair and on and off the examination table without difficulty. He noted that she walked without difficulty, without an assistive device, and with a normal gait. He found no evidence of scoliosis, no spasm of the paraspinous muscles, and no evidence of kyphosis. Sitting and supine straight leg raise tests were positive in both legs although the test caused shooting pain on the right side only. The claimant was not able to walk on her toes or heels, she had difficulty squatting, bending, and tandem heel walking. The range of motion in her cervical spine was normal but it was limited in the lumbar spine. Dr. Bonnaig opined that the claimant was limited to standing and walking only occasionally in an eight-hour work day and has a limited ability to bend or stoop.

On October 9, 2015, the claimant followed up at UMC's neurology clinic. Her chief complaints were seeing flashes of light and having blurry vision, headache episodes, feeling tired and lethargic, tremors, and anxiety. Her seizures were under control since increasing her medication. She had a normal range of motion, normal strength, and a normal gait. She was taking Vistaril, Lamictal, and Ibuprofen.

Ms. Hussey was seen at UMC on November 13, 2015 for shortness of breath and heart fluttering.[54] She was noted to be a poor historian. She was unable to state

_____

[54]    Rec. Doc. 7-1 at 568-569.

how often she gets palpitations, but she stated that the last episode was a week earlier. She was given a prescription for her cough, she was advised to use over the counter medications for gastro-esophageal reflux, and an EKG was ordered.

An echocardiogram obtained on November 19, 2015 at UMC showed normal left ventricular function but diastolic dysfunction.[55]

The claimant returned to UMC on December 3, 2015 with regard to hearing loss on the left.[56] The doctor opined that her asymmetric sensorineural hearing loss was likely related to her seizure disorder. An MRI was ordered. The doctor also diagnosed eustachian tube dysfunction, for which she recommended Flonase and autoinsufflation (or gently blowing against pinched nostrils to pop the ears).

On December 28, 2015,[57] Ms. Hussey underwent an MRI examination of the brain in connection with her complaints of left-sided hearing loss, headaches, and blurry vision. The MRI showed mastoid inflammatory disease on the left, soft tissue thickening and enhancement in the external canal on the left with otitis externa not excluded, and small foci of signal abnormality in the external capsule bilaterally, suggesting prior lacunar infarcts.

---

[55] Rec. Doc. 7-1 at 566-565.

[56] Rec. Doc. 7-1 at 562-563.

[57] Rec. Doc. 7-1 at 614-615.

Ms. Hussey was seen in the urology clinic at UMC on March 14, 2016.[58] She gave a history of recurrent microscopic hematuria after being exposed to something in drinking water five years previously. The impression was a borderline abnormal enlargement of the liver but no abnormalities in the kidneys, ureters, or bladder. The physician noted that he had no comment regarding the possibility that her condition resulted from her drinking water.

Ms. Hussey followed up at UMC with regard to her hearing loss on April 28, 2016.[59] She complained of muffled hearing but stated that her seizures were better controlled. Testing showed significant improvement in her hearing, with her sensorineural hearing resolved but a slight conductive hearing loss remaining, likely due to better control of seizures. She was to restart Flonase and use autoinsufflation.

On May 20, 2016, the claimant was seen at UMC's neurology clinic.[60] She could not state when her last seizure occurred. She was to continue taking Lamictal.

On July 7, 2016, the claimant testified at a hearing regarding her symptoms and her medical treatment. She explained that she injured her lumbar spine in 2010 while helping a patient who had fallen. Her treating physician, Dr. Muldowny, referred her to physical therapy and to pain management, and he also recommended

---

[58]     Rec. Doc. 7-1 at 606-610.

[59]     Rec. Doc. 7-1 at 582-588.

[60]     Rec. Doc. 7-1 at 579-580.

lumbar surgery. She stated that she was unable to undergo the recommended surgical procedure due to a platelet disorder that she contended was the result of exposure to chemicals in her neighborhood. She explained that she attempted to work as a part-time, light-duty personal care attendant after her back was injured, but found that the injury precluded her from performing even the limited duties required in that position. Therefore, she stopped working in 2012. She testified that her back injury limited her to sitting for approximately forty-five minutes at a time before her feet go numb and her back and leg pain worsen. She testified that she experienced shooting pains in her legs and feet when walking or standing and stated that she could walk for only about fifteen to twenty minutes at a time. Ms. Hussey explained that she limited her daily activities to accommodate her pain level. For example, she does minimal house work over a period of time, she shops at convenience stores rather than at Walmart to reduce the amount of walking, she does not walk across large parking lots, and she does not walk to her mailbox every day. Nevertheless, Ms. Hussey lives alone, tends to her personal grooming needs, prepares simple meals, can drive short distances although she prefers not to, and can shop for herself.

In addition to her back problem, Ms. Hussey reported severe headaches that last for approximately six to twelve hours at a time and occur two to three times per

month, a history of epileptic seizures, and hearing loss.  At the time of the hearing, she had recently been diagnosed with congestive heart failure.

Ms. Hussey now seeks to have the Commissioner's adverse ruling reversed.

## Analysis

### A.    Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[61]  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[62]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[63]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[64]  In reviewing the Commissioner's findings, a

---

[61]     *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[62]     *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[63]     *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[64]     42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[65]  Conflicts in the evidence[66] and credibility assessments[67] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[68]

## B.    Entitlement to Benefits

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[69]  If unmarried and between fifty and sixty years old, the widow of a fully insured individual is entitled to widow's insurance benefits if she is disabled and her disability began no more than seven years after the wage earner's death or seven years after she was last entitled to

---

[65]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[66]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[67]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[68]    *Wren v. Sullivan*, 925 F.2d at 126.

[69]    See 42 U.S.C. § 423(a).

survivor's benefits.[70]   Every individual who meets certain income and resource requirements, has filed an application for benefits, and is determined to be disabled is eligible to receive Supplemental Security Income ("SSI") benefits.[71]

A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[72]   A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[73]

## C.   Evaluation Process and Burden of Proof

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled.   This process requires the ALJ to determine whether the

---

[70]   42 U.S.C. § 402(e); 20 C.F .R. § 404.335.

[71]   42 U.S.C. § 1382(a)(1) & (2).

[72]   42 U.S.C. § 1382c(a)(3)(A).

[73]   42 U.S.C. § 1382c(a)(3)(B).

claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[74] "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."[75]

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[76] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[77] The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[78]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can

---

[74]     20 C.F.R. § 404.1520.

[75]     *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

[76]     20 C.F.R. § 404.1520(a)(4).

[77]     20 C.F.R. § 404.1545(a)(1).

[78]     20 C.F.R. § 404.1520(e).

perform other substantial work in the national economy.[79]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[80]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[81]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[82]

**D.    The ALJ's Findings and Conclusions**

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since September 10, 2016.[83]  This finding is supported by substantial evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments:  degenerative disc disease of the lumbar spine with radiculopathy, congestive heart failure, migraine, and major motor seizures.[84]  This finding is supported by substantial evidence in the record.

---

[79]    *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[80]    *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[81]    *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[82]    *Greenspan v. Shalala*, 38 F.3d at 236.

[83]    Rec. Doc. 7-1 at 31.

[84]    Rec. Doc. 7-1 at 31.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[85] The claimant does not challenge this finding.

The ALJ found that the claimant has the residual functional capacity to perform light work except for the following: she can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; can occasionally stoop, crouch, kneel, or crawl; must avoid concentrated exposure to excessive vibration and to excessive heat; must avoid concentrated exposure to irritants such as fumes, odors, dust, and gases; and must avoid concentrated use of moving or hazardous machinery.[86] The claimant challenged this finding.

At step four, the ALJ found that the claimant is not capable of performing any past relevant work.[87] The claimant did not challenge this finding.

At step five, the ALJ found that the claimant was not disabled from September 10, 2010 through August 30, 2016 (the date of the decision) because there are jobs in the national economy that she can perform.[88] The claimant challenged this finding.

---

[85]     Rec. Doc. 7-1 at 32.

[86]     Rec. Doc. 7-1 at 32.

[87]     Rec. Doc. 7-1 at 38.

[88]     Rec. Doc. 7-1 at 39.

E.     **The Allegations of Error**

The claimant contends that the ALJ erred (1) by improperly evaluating the consultative examiner's medical opinions; (2) by improperly evaluating the claimant's residual functional capacity; and (3) by improperly applying the Medical-Vocational Guidelines.

F.     **Evaluation of the Consultative Examiner's Opinions and**

The claimant contends that the ALJ erred in failing to properly weigh the medical opinions. More particularly, she contends that the ALJ erred in failing to give more weight to the opinions of Dr. Bonnaig, the consultative examiner, than to Dr. Scardino, a nonexamining physician.

The Social Security regulations and rulings explain how medical opinions are to be weighed.[89] Generally, an ALJ must evaluate all of the evidence in the case and determine the extent to which medical source opinions are supported by the record. More weight should usually be given to the opinion of a source who examined the claimant than to the opinions of a source who did not examine the claimant.[90] However, the weight given to opinions from nonexamining physicians depends on "the degree to which they provide supporting explanations for their opinions."[91]

---

[89]     20 C.F.R. § 404.1527(c), § 416.927(c), SSR 96-2p, SSR 96-5p.

[90]     20 C.F.R. § 404.1527(c)(1).

[91]     *Giles v. Astrue*, 433 Fed. App'x 241, 246 (5th Cir. 2011) (citing 20 C.F.R. § 1527(c)(3)).

In this case, Dr. Bonnaig examined the claimant on March 28, 2015 and opined that Ms. Hussey is capable of standing and walking only occasionally in an eight-hour work day. Because the Social Security regulations define the term "occasionally" as "occurring from very little up to one-third of the time,"[92] and "[j]obs are sedentary if walking and standing are required occasionally,"[93] Dr. Bonnaig's inherent opinion was that Ms. Hussey was limited to sedentary work.

Just a few days later, on April 2, 2015, Dr. Scardino opined that Ms. Hussey was capable of standing or walking for six hours in an eight-hour work day and therefore was capable of light work.[94] Dr. Scardino did not meet or examine Ms. Hussey, but in reaching his conclusions, he reviewed Dr. Bonnaig's report and records from the claimant's treating physicians. In particular, Dr. Scardino noted that the claimant had positive straight leg raise tests when evaluated by Dr. Bonnaig. Despite his acknowledgment of those positive tests, however, he concluded that Ms. Hussey was capable of light work. Dr. Scardino also reviewed Dr. Muldowny's and Dr. Hodges's records. Each of them had evaluated the claimant's lumbar complaints on numerous occasions, and each of them found that she had a positive straight leg raise test at only one visit each. There was a positive straight leg raise test on March

---

[92]     SSR 83-10.

[93]     10 C.F.R. § 416.967(a).

[94]     SSR 83-10.

26, 2013 with Dr. Muldowny and a positive straight leg raise test with Dr. Hodges on June 19, 2013. Subsequent testing, however, yielded negative results on that test. Therefore, the evidence in the record did not establish that the claimant had consistently positive straight leg raise tests.

Dr. Scardino also noted that Dr. Bonnaig found that, despite having a positive straight leg raise, Ms. Hussey walked without difficult, her gait was normal, there was no evidence of scoliosis, but had difficulty walking on heels, bending, and squatting. Thus, Dr. Scardino fairly summarized Dr. Bonnaig's findings. He further noted that the medical evidence was partially consistent with the claimant's allegations, stated symptoms, and functional limitations. He noted that there was no scoliosis or kyphosis, no paraspinous muscle spasm, normal grip strength, normal motor strength in all extremities, normal sensation, and normal reflexes. Apparently, in his opinion, the straight leg raise test with Dr. Bonnaig was insufficient to support limiting the claimant to sedentary work in light of the other findings by Dr. Bonnaig, Dr. Muldowny, and Dr. Hodges.

The ALJ stated that she gave Dr. Scardino's opinions great weight because his opinions were generally consistent with the medical record, and this Court agrees with that assessment. Dr. Scardino's opinions were supported by evidence in the record. The ALJ stated that she gave little weight to Dr. Bonnaig's opinions because they were based on a single examination of the claimant. The ALJ should not have

discounted his opinions on that basis in favor of the opinions of a doctor who did not examine the claimant at all. However, the ALJ also stated that she discounted Dr. Bonnaig's opinions regarding the claimant's ability to walk and stand because they were not consistent with his findings of a normal gait, no muscle spasms, and full muscle strength. This was a valid basis on which to discount the amount of weight given to that opinion. Accordingly, this Court finds that the ALJ did not err in weighing the medical opinions.

## G.    Evaluation of the Claimant's Residual Functional Capacity

The ALJ is responsible for determining a claimant's residual functional capacity.[95] In making a finding in that regard, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the plaintiff's ability despite any physical and mental limitations.[96] The evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled.[97]

---

[95]    *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).

[96]    *Martinez v. Chater*, 64 F.3d at 176.

[97]    *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Loya v. Heckler*, 707 F.2d 211, 215 (5th Cir. 1983).

In this case, the ALJ gave four reasons for her decision concerning the claimant's residual functional capacity.

First, the ALJ found that the medical evidence was not consistent with disabling functional limitations. This Court agrees. The claimant's primary contention is that low back pain limits her functionality. The evidence in the record showed that Ms. Hussey's seizure disorder and headaches were controlled by medication. Conditions that are controlled or controllable by medication or treatment are not disabling.[98] Pain can constitute a disabling impairment,[99] but pain is disabling only when it is constant, unremitting, and wholly unresponsive to therapeutic treatment.[100] Mild or moderate pain is not disabling. Furthermore, subjective complaints, such as complaints of pain, must be corroborated by objective medical evidence.[101] While an ALJ must take into account a claimant's subjective allegations of pain in determining residual functional capacity, the claimant must produce objective medical evidence of a condition that reasonably could be expected to produce the level of pain alleged.[102] The mere existence of pain does not

---

[98]     *Fraga v. Bowen*, 810 F.2d at 1305.

[99]     *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994); *Cook v. Heckler*, 750 F.2d 391, 395 (5th Cir. 1985).

[100]     *Falco v. Shalala,* 27 F.3d at 163; *Selders v. Sullivan*, 914 F.2d 614, 618-19 (5th Cir. 1990).

[101]     *Chambliss v. Massanari*, 269 F.3d at 522.

[102]     *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989).

automatically create grounds for disability, and subjective evidence of pain does not take precedence over conflicting medical evidence.[103]   The absence of objective factors can justify the conclusion that a witness lacks credibility,[104] and the ALJ's decision on the severity of pain is entitled to considerable judicial deference.[105]

Although the claimant does have a back condition that can cause pain, there is no evidence in the record that Ms. Hussey has seen Dr. Muldowny, her orthopedist, or Dr. Hodges, her pain management doctor, since 2013.  In December 2015, she was no longer taking prescription painkillers and was taking only Ibuprofen for pain.[106] Although she was seen in the ENT clinic, the neurology clinic, and the urology clinic at UMC after she stopped seeing Dr. Muldowny and Dr. Hodges, there is no evidence that she sought treatment for her back condition at UMC or through any other health care provider after she stopped seeing Dr. Muldowny and Dr. Hodges.  This indicates that the limitations and pain allegedly caused by her low back injury are not as severe as the claimant contends.

---

[103]     *Harper v. Sullivan*, 887 F.2d at 96.

[104]     *Dominguez v. Astrue*, 286 Fed. App'x 182, 187 (5th Cir. 2008) (citing *Hollis v. Bowen*, 837 F.2d at 1385).

[105]     *Chambliss v. Massanari*, 269 F.3d at 522; *James v. Bowen*, 793 F.2d 702, 706 (5th Cir. 1986); *Wren v. Sullivan*, 925 F.2d at 128.

[106]     Rec. Doc. 7-1 at 562.

The ALJ's second reason for her residual functional capacity assessment was that the claimant's description of her symptoms was vague, lacking in specificity, and not entirely convincing. This Court agrees. Ms. Hussey did not consistently report which leg had radiating pain, did not identify the leg that gave out causing her to fall, could not consistently state the frequency of seizures and headaches, or identify when the seizures and headaches occurred.

The ALJ's third reason for finding the claimant not disabled was based on her activities of daily living. Ms. Hussey was able to cook, clean, drive, and live independently. While she modified her behavior to accommodate her alleged impairments, her activities were not entirely consistent with the level of functional impairment she claimed.

Finally, as noted above, the ALJ did not improperly weigh the medical opinions regarding the claimant's functional capabilities.

This Court's review of the record and the ALJ's ruling indicates that the ALJ properly evaluated the claimant's subjective complaints and the evidence in the record and properly reached a residual functional capacity finding that is supported by substantial evidence in the record. Therefore, the claimant failed to prove that she is disabled.

## H.    Application of the Medical-Vocational Guidelines

Use of the Medical-Vocations Guidelines, sometimes referred to as "the Grids" or "the Grid Rules" "is only appropriate 'when it is established that a claimant suffers only from exertional impairments, or that the claimant's nonexertional impairments do not significantly affect his residual functional capacity.'"[107]   If, however, the claimant suffers from nonexertional impairments or a combination of exertional and nonexertional impairments, then the Commissioner must rely on a vocational expert to establish that there are jobs in the national economy that the claimant can perform.[108]

In this case, the claimant's primary complaint is back pain, and Ms. Hussey contends that back pain significantly affects her residual functional capacity.  Pain may constitute a nonexertional factor that can limit the range of jobs a claimant can perform,[109] and in this case, it is alleged to be the primary reason why the claimant contends that she is disabled.  When a claimant contends that her functional capacity is significantly limited by pain, an ALJ must rely on expert vocational testimony to

---

[107]    *Watson v. Barnhart*, 288 F.3d 212, 216 (5th Cir. 2002) (quoting *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999)).

[108]    *Newton v. Apfel*, 209 F.3d 449, 458 (5th Cir. 2000).

[109]    *Carter v. Heckler*, 712 F.2d 137, 142 (5th Cir. 1983).

establish that jobs exist.[110]  Accordingly, the ALJ did not err in failing to apply the

Grids in this case, and the ALJ's failure to apply the Grids does not require remand

of his decision.

## **Conclusion**

Given the foregoing,  it is the conclusion of this Court that the decision of the

Commissioner be AFFIRMED and this matter be dismissed with prejudice.

Signed in Lafayette, Louisiana, this 15th day of November 2018.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[110]     *Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994).